# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Demain Dominguez, aka Demian Dominguez,

Petitioner

v.

Brian E. Williams, et al.,

Defendants

Case No.: 2:12-cv-01608-JAD-DJA

**Order Denying Petition for
Habeas Relief and
Closing Case**

Petitioner Demain Dominguez was found guilty of robbery, burglary, conspiracy to commit robbery, first-degree murder, conspiracy to commit murder, conspiracy to commit a crime, and two use-of-deadly-weapon enhancements in Nevada State Court and sentenced to multiple, consecutive 20-years-to-life sentences.[1] In a six-count petition, Dominguez seeks a writ of habeas corpus under 28 U.S.C. § 2254 based on claims of insufficient evidence and ineffective trial counsel.[2] I now address these claims on their merits. Because I find that habeas relief is not warranted, I deny Dominguez's petition, deny him a certificate of appealability, and close this case.

## Background

**A.     The facts underlying Dominguez's conviction[3]**

On January 30, 2007, at 3:39 a.m., Mark Friedman called 9-1-1, reporting that he had been attacked and robbed by numerous individuals upon entering his home. Friedman's

---

[1] ECF No. 23-12.

[2] ECF No. 61.

[3] These facts are taken from Detective Dolphis Boucher's and Dr. Gary Telgenhoff's trial testimonies. ECF Nos. 23, 23-4. For simplicity's sake, I cite to these exhibits generally for this entire background section.

girlfriend, Lilani Tomines, was allegedly asleep in the home when the attack occurred. Friedman was stabbed three times in the abdomen and kicked repeatedly in the head. He was taken to the hospital where an exploratory laparotomy was done to determine whether any of his vital organs had been injured. Friedman aspirated vomit during the procedure, which resulted in him fatally suffering from asphyxiation due to pneumonia several days later.

Tomines's telephone records revealed that she called Dominguez three times on the night of Friedman's attack. Dominguez originally denied being present at the attack and minimized his relationship with Tomines. He later admitted to being present at the attack, but he claimed that he was there only to speak with Friedman and attempted to defend him during the attack. Dominguez and his brother, whose fingerprint was found at the scene, were both arrested. Tomines was also arrested after it was determined that she owed Friedman a substantial sum of money and fraudulently attempted to cash Friedman's checks.

**B.    Procedural history**

On July 13, 2009, a jury found Dominguez guilty of conspiracy to commit robbery, conspiracy to commit murder, conspiracy to commit a crime, burglary, robbery with the use of a deadly weapon, and first-degree murder with the use of a deadly weapon.[4] Dominguez appealed, and the Nevada Supreme Court affirmed on December 10, 2010.[5] Remittitur issued on January 4, 2011.[6] Approximately eight months later, Dominguez filed a state habeas petition.[7] The state

---

[4] ECF No. 23-3.

[5] ECF No. 23-21.

[6] ECF No. 23-22.

[7] ECF No. 24.

district court denied the petition, and Dominguez appealed.[8]  While his appeal was pending, Dominguez filed a second state habeas petition, which the state district court also denied.[9]

On July 25, 2012, the Nevada Supreme Court affirmed the denial of Dominguez's first state habeas petition, and remittitur issued on August 20, 2012.[10]  Approximately six months later, the Nevada Supreme Court affirmed the denial of his second state habeas petition as procedurally barred.[11]

Dominguez dispatched his federal habeas petition for filing on or about September 6, 2012.[12]  Dominguez filed a counseled, amended petition on September 26, 2013.[13]  He then moved for leave to conduct discovery and for a court order to obtain documents, and the respondents moved to dismiss Dominguez's amended petition.[14]  I denied the respondents' motion to dismiss without prejudice and granted Dominguez's motion for leave to conduct discovery.[15]

Following the completion of discovery, Dominguez filed a third state habeas petition, which was denied as untimely, successive, and procedurally barred by the state district court.[16] The Nevada Supreme Court affirmed the denial,[17] and remittitur issued on July 19, 2016.[18]

---

[8] ECF Nos. 24-4, 24-6.

[9] ECF Nos. 24-10, 24-15.

[10] ECF Nos. 24-23, 24-24.

[11] ECF No. 24-25.

[12] ECF No. 1.

[13] ECF No. 18.

[14] ECF Nos. 26, 27.

[15] ECF No. 37 at 6.

[16] ECF Nos. 59-1, 59-8.

[17] ECF No. 59-13.

[18] ECF No. 59-15.

After seeking leave, Dominguez filed a counseled, second-amended federal petition and then a third-amended federal petition.[19]  The respondents again moved for dismissal.[20]  I granted the motion to dismiss in part, dismissing Ground 6.[21]  The respondents answered the remaining grounds in Dominguez's third-amended petition on May 16, 2018,[22] and Dominguez replied on November 28, 2018.[23]

In Dominguez's remaining grounds for relief, he alleges the following violations of his federal constitutional rights:

1.  The evidence at trial was insufficient to support his convictions.

2.  Trial counsel failed to move to dismiss the murder and conspiracy to commit murder charges.

3.  Trial counsel failed to investigate the State's witnesses.

4.  Trial counsel failed to object to the reasonable-doubt jury instruction

5.  There were cumulative errors made by his trial counsel warranting relief.[24]

### Discussion

**A.  Legal standards**

*1.  Review under the Antiterrorism and Effective Death Penalty Act (AEDPA)*

If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted

---

[19] ECF Nos. 50, 61.

[20] ECF No. 63.

[21] ECF No. 70.

[22] ECF No. 78.

[23] ECF No. 85.

[24] ECF No. 61.

in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[25]  A state court acts contrary to clearly established federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[26]  And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[27]  Section 2254 does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[28]  The "objectively unreasonable" standard is difficult to satisfy;[29] "even 'clear error' will not suffice."[30]

Habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[31] As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in

---

[25] 28 U.S.C. § 2254(d).

[26] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[27] *White v. Woodall*, 134 S. Ct. 1697, 1705–07 (2014).

[28] *Id.* at 1705–06.

[29] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[30] *Wood v. McDonald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

[31] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

existing law beyond any possibility of fairminded disagreement."[32]  "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under Section 2254(d) is precluded.[33]  AEDPA "thus imposes a 'highly deferential standard for evaluating state-court ruling,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"[34]

If a federal district court finds that the state court committed an error under § 2254, the district court must then review the claim de novo.[35]  The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief,[36] but state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[37]

### 2.  Standard for federal habeas review of an ineffective-assistance claim

The right to counsel embodied in the Sixth Amendment provides "the right to the effective assistance of counsel."[38]  Counsel can "deprive a defendant of the right to effective assistance[] simply by failing to render 'adequate legal assistance[.]'"[39]  In the hallmark case of *Strickland v. Washington*, the United States Supreme Court held that an ineffective-assistance claim requires a petitioner to show that: (1) his counsel's representation fell below an objective

---

[32] *Id.* at 103.

[33] *Id.* at 101.

[34] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

[35] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[36] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[37] 28 U.S.C. § 2254(e)(1).

[38] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[39] *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 335–36 (1980)).

standard of reasonableness under prevailing professional norms in light of all of the circumstances of the particular case;[40] and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.[41]

A reasonable probability is "probability sufficient to undermine confidence in the outcome."[42] Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of hindsight.[43] "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practice or most common custom."[44] The burden is on the petitioner to overcome the presumption that counsel made sound trial-strategy decisions.[45]

The United States Supreme Court has described federal review of a state supreme court's decision on an ineffective-assistance claim as "doubly deferential."[46] So, I "take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'"[47] And I consider only the record that was before the state court that adjudicated the claim on its merits.[48]

---

[40] *Id.* at 690.

[41] *Id.* at 694.

[42] *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

[43] *Strickland*, 466 U.S. at 689.

[44] *Harrington*, 562 U.S. at 104.

[45] *Id.*

[46] *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

[47] *Id.*

[48] *Id.* at 181–84.

**B.** **Evaluating Dominguez's remaining claims**

Dominguez asserts that there was insufficient evidence to support his convictions and his trial counsel was ineffective. I now address these claims in the order in which they were made.[49]

### *1.* *Ground 1*

In Ground 1, Dominguez asserts that he was denied his due-process rights under the Fifth and Fourteenth Amendments because the evidence at his trial was legally insufficient to support his murder, robbery, and conspiracy-to-commit-robbery convictions.[50] Dominguez contends with regard to the murder conviction that Friedman's surgery was an intervening event that proximately caused his death—not the stabbing—and that, with regard to the conspiracy conviction, the evidence was far more consistent with an agreement to physically attack

---

[49] Dominguez argues that his claims should be reviewed de novo because 28 U.S.C. § 2254(d) is unconstitutional. ECF No. 85 at 15–21. Dominguez argues that: (1) 28 U.S.C. § 2254(d) "violates § 1 of the Fourteenth Amendment and the Due Process Clause of the Fifth Amendment[] by depriving citizens in state custody of their fundamental right to meaningful federal review of the federal legality of their state detention"; (2) 28 U.S.C. § 2254(d) "unlawfully suspends the writ of habeas corpus in violation of Article I, § 9, cl. 2"; and (3) 28 U.S.C. § 2254(d) "unlawfully impinge[s] on the judicial power vested exclusively in the judiciary by Article III of the Constitution." *Id.* at 15. He admits that his latter two arguments have been rejected by the Ninth Circuit, *id.* at 16 (citing *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007)), so I decline to consider them because I am bound by that authority. With regard to his first argument—that 28 U.S.C. § 2254(d) violates the Fourteenth and Fifth Amendments— Dominguez argues that 28 U.S.C. § 2254(d) requires federal courts to defer to the state court's interpretation of federal law, meaning that in cases in which a state imprisonment violates the federal constitution, the federal court is often required to "stay its hand and deny relief." *Id.* at 20. I find that this argument lacks merit. Although not discussed in the context of the Fourteenth and Fifth Amendments, the Ninth Circuit has stated generally that "[t]he constitutional foundation of § 2254(d)(1) is solidified by the Supreme Court's repeated application of the statute." *Crater*, 491 F.3d at 1129. Further, none of Dominguez's claims violate the federal constitution; therefore, Dominguez is not being denied relief solely due to the deference that is given to the state court under 28 U.S.C. § 2254(d).

[50] ECF No. 61 at 9.

Friedman than to rob him.[51] The Nevada Supreme Court rejected these theories in Dominguez's

appeal of his judgment of conviction based on the evidence:

> First, Dominguez argues that his murder conviction must be reversed because the victim died of intervening medical error, not of the stab wounds that placed him in the hospital. We reject that contention. The victim reported in his 9-1-1 call that he had been attacked by a group of individuals who were waiting for him inside when he returned home. Dominguez admitted to being part of that group, though he asserted that he was there to talk to the victim and protect him from the other three attackers who stabbed him, one of whom was Dominguez's brother. The victim died after exploratory surgery. A medical examiner testified that the victim's cause and manner of death were homicide due to multiple stab wounds. We conclude that because these injuries were a "substantial factor" in the victim's death, Dominguez cannot escape liability for murder. *Lay v. State*, 110 Nev. 1189, 1192–93, 886 P.2d 448, 450 (1994).

> Second, Dominguez claims that there is insufficient evidence to support his convictions for robbery with the use of a deadly weapon and conspiracy to commit robbery. The jury heard evidence that Dominguez conspired with the victim's girlfriend, Liliani Tomines, to murder the victim, including (1) their initial denials that they knew each other; (2) their subsequent confrontation with 112 phone calls made between them in a period of a few weeks, including on the night of the murder; (3) evidence that Tomines let the group that attacked the victim into the house for the purpose of lying in wait for the victim; (4) Dominguez's admission of involvement; and (5) the victim's exclamation that the group that attacked him had stolen his wallet. A rational juror, looking at Tomines'[s] and Dominguez's coordinated conduct, could have inferred the existence of an agreement to rob the victim as part of the plan to murder him and could have therefore found beyond a reasonable doubt that Dominguez conspired to commit, and did in fact commit, robbery with the use of a deadly weapon. *See Origel-Candido v. State*, 114 Nev. 378, 381, 956 P.2d 1378, 1380 (1998); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); NRS 200.380(1); NRS 193.165; NRS 199.480. Further, we reject Dominguez's assertion that because his brother, a co-conspirator tried separately, was acquitted of robbery and conspiracy to commit robbery, Dominguez's convictions must be reversed as

---

[51] *Id.* at 11, 13.

well. *See Hilt v. State*, 91 Nev. 654, 662, 541 P.2d 645, 650 (1975).[52]

I find that this ruling of the Nevada Supreme Court was reasonable.[53] "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."[54] A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."[55] As the United States Supreme Court held in *Jackson v. Virginia*, on direct review of a sufficiency-of-the-evidence claim, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[56] The evidence must be viewed "in the light most favorable to the prosecution."[57] Federal habeas relief is available only if the state-court determination that

---

[52] ECF No. 23-21 at 2–3.

[53] Dominguez argues that I should review this ground de novo because the Nevada Supreme Court erroneously determined that Friedman's injuries were a "substantial factor" in his death and failed to discuss whether the state adduced sufficient evidence at trial to allow any rational juror to find causation beyond a reasonable doubt. ECF No. 85 at 29-30. Dominguez's first assertion lacks merit—as I will discuss, the Nevada Supreme Court did not erroneously determine that Friedman's injuries were a "substantial factor" in his death. Regarding Dominguez's second assertion, it is true that the Nevada Supreme Court only cited *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which discusses reasonable doubt in sufficiency-of-the-evidence claims in the context of Dominguez's robbery and conspiracy to commit robbery convictions. However, that does not imply that the Nevada Supreme Court failed to apply this standard to the evidence presented on the murder conviction. So I decline to review Ground 1 de novo.

[54] *In re Winship*, 397 U.S. 358, 364 (1970).

[55] *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

[56] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[57] *See id*.

10

the evidence was sufficient to support a conviction was an "objectively unreasonable" application of *Jackson*.[58]

### a. Relevant evidence

Brian Ward, a coworker of Mark Friedman, testified that Friedman gave him a ride home from work on January 30, 2007, at approximately 3:10 a.m.[59] When Ward opened Friedman's truck's passenger door to get into the vehicle, Friedman was talking on his cell phone, and Ward heard Friedman say, "'I'll be home in 30 minutes. Stop calling me.'"[60] It was later determined that Friedman was speaking to his girlfriend and business partner, Lilani Tomines, during that telephone call.[61]

Approximately thirty minutes later, Friedman made a telephone call to 9-1-1, explaining that, after coming home from work, numerous individuals, who Friedman described as being Hispanic, "hit [him] when [he] came in the door."[62] Friedman also explained that the individuals kicked him in the "head like seven or eight times," took his "wallet and [his] phone and everything," and then "put [him] in the garage."[63] During Friedman's 9-1-1 telephone call, Tomines came into the garage and indicated that she had been sleeping and was unaware of what had happened to Friedman.[64]

---

[58] *See Juan H.*, 408 F.3d at 1275 n.13.

[59] ECF No. 22-3 at 55, 58.

[60] *Id.* at 59.

[61] ECF No. 23 at 78.

[62] ECF No. 23 at 60, 63.

[63] *Id.*

[64] *Id.* at 62, 67.

Officer Garth Findley testified that he was the first officer to respond to a dispatch call for a robbery at Friedmann's residence at 3:47 a.m. on January 30, 2007.[65] When Officer Findley approached the house, he saw Friedman sitting in a chair in his garage with Tomines standing next to him.[66] Friedman "had blood all over him" and told Officer Findley, consistent with his 9-1-1 call, that he "parked his truck on the street, walked . . . through the garage[,] . . . and once he entered . . . the door that leads into the house, . . . he was jumped by . . . approximately five Hispanic males and one Hispanic female."[67] Friedman also explained that the individuals "beat him with an unknown object and . . . robbed him, taking his keys and wallet."[68] The paramedics arrived approximately five minutes after Officer Findley, and Officer Findley did not render any first aid in the meantime.[69]

Officer Findley spoke with Tomines briefly, and Tomines explained that she arrived at Friedman's house at approximately 1:00 a.m. on January 30, 2007, and went to sleep.[70] Tomines then explained—inconsistent with what was heard on the 9-1-1 recording—that she awoke at approximately 3:30 a.m., and when she noticed that Friedman was not home, she called his cellular telephone.[71] Friedman "answered his cell phone and stated that he[ was] already home,

---

[65] ECF No. 22-3 at 37–39.

[66] *Id.* at 41–42, 47.

[67] *Id.* at 43–44.

[68] *Id.* at 44.

[69] *Id.* at 53.

[70] *Id.* at 46.

[71] *Id.* at 47.

he [was] in the hallway, and that's when she went out and saw him."[72]  Friedman then told Tomines that he had been jumped by individuals who possibly followed him home.[73]

Louise Renhard, a senior crime-scene analyst, testified that she also responded to Friedman's residence on January 30, 2007.[74]  Renhard testified that the front door of the residence was opened inward, that the "metal grated security door on the exterior" of the front door was double locked, that the door from the inside of the garage into the laundry room area of the residence was shut but not locked, and that except for the "garage bay door[,] . . . all the rest of the [doors and windows] were secured, closed and locked."[75]  Renhard explained that there was no sign of forced entry anywhere in the residence.[76]  Although Friedman told the 9-1-1 operator that the individuals had taken his keys, Renhard found Friedman's keys in his shirt pocket.[77]  She, however, did not recover his wallet.[78]  Renhard testified that she "believed from what [she] w[as] told by medical personnel that the victim was going to live."[79]

Detective Gordon Martines, a robbery detective, testified that he too responded to Friedman's residence on January 30, 2007.[80]  Detective Martines also did not see any signs of forced entry anywhere in the residence, and he testified that the interior of the residence "didn't

---

[72] *Id.*

[73] *Id.*

[74] ECF No. 22-4 at 22, 24.

[75] *Id.* at 34-36.

[76] *Id.* at 37.

[77] *Id.* at 74.

[78] *Id.* at 75.

[79] *Id.*

[80] ECF No. 22-4 at 79–80.

appear to be disturbed in any way."[81] Detective Martines interviewed Tomines at the scene and testified that "she wasn't all that upset about what had happened" and "appeared to be rather detached and cold toward the circumstances that had occurred."[82] Detective Martines did not interview Friedman because he was in surgery and then later passed away.[83] Detective Martines explained that Friedman's injuries were "a little excessive" for a robbery.[84]

Dr. Gary Telgenhoff, a medical examiner with the Clark County Coroner's Office, testified that while Dr. Kubiczek performed Friedman's autopsy, he conducted an autopsy report of Friedman, which included reviewing Friedman's hospital medical reports.[85] Friedman was stabbed three times "in the vicinity of the abdomen," had blunt force trauma injuries to his head, had defensive wounds on his hands, and was in the hospital for nine days prior to his death.[86] After Friedman's admission to the hospital, surgeons did "an exploratory laparotomy where they want to look and make sure no vital organs have been pierced by whatever caused the stabs."[87] The laparotomy, which Dr. Telgenhoff clarified "wasn't an elective surgery," showed "no direct internal injury, but [the procedure was needed] to be sure."[88] Dr. Telgenhoff explained that "because [Friedman] was not ideal for a surgical candidate," he "had some episodes of throwing

---

[81] *Id.* at 81.

[82] *Id.* at 84.

[83] *Id.* at 88.

[84] *Id.* at 89.

[85] ECF No. 23 at 6, 10, 12.

[86] *Id.* at 10, 18, 24.

[87] *Id.* at 11.

[88] *Id.*

14

up, vomiting" during the procedure.[89]  Friedman ultimately fatally suffered from asphyxiation

from aspiration pneumonia, which is a risk faced by anyone who gets a tracheotomy.[90]

Dr. Telgenhoff then testified extensively about the cause of Friedman's death.  Dr.

Telgenhoff explained that, in his opinion, Friedman aspirated and died "from complications of

treatment for those stab wounds."[91]  Dr. Telgenhoff further explained that "[t]he proximal cause

of death, the cause that brought him to his death[, was] multiple sharp force injuries due to

assault."[92]  Dr. Telgenhoff testified that the medical definition of "proximate causation" means

"the underlying condition, the underlying episode that brought about the death."[93]  Dr.

Telgenhoff determined that the manner of death was a homicide because, "but for being

assaulted[, Friedman] wouldn't have been at the hospital and died in the manner he did."[94]  Dr.

Telgenhoff then clarified:

> one could easily say that, well, pneumonia killed him, and ignore
> the rest.  That wouldn't be quite accurate.  One could say that the
> stab wounds killed him, but we know that they weren't themselves
> lethal, so that wouldn't be quite correct.  But the underlying
> process leading to the death was the attack and that's all there is to
> it, the way I see it.[95]

Dr. Telgenhoff did concede that "[i]f it were not for the need for emergent surgery and the

complications from that emergent surgery, [Friedman] might have lived."[96]

---

[89] *Id.* at 11–12.

[90] *Id.* at 28, 36.

[91] *Id.* at 12.

[92] *Id.* at 28.

[93] *Id.* at 35.

[94] *Id.* at 28.

[95] *Id.* at 35.

[96] *Id.* at 29.

Detective Dolphis Boucher, a homicide detective, testified that he took over the investigation following Friedman's death "because his death was a result of the injuries."[97] Detective Boucher went to Friedman's residence on February 11, 2007, to observe the crime scene.[98] Based on the blood and other evidence, Detective Boucher explained that Friedman was attacked in the laundry room, just inside from the garage, and that the attackers likely left the residence through the front door, not the garage, meaning that someone locked the door from the inside after they left.[99]

After investigating Tomines's telephone records, Detective Boucher learned that Tomines had spoken with Dominguez on the telephone at least three times on the night of Friedman's attack: 9:00 p.m. on January 29, 2007; 12:26 a.m. on January 30, 2007; and 2:10 a.m. on January 30, 2007.[100] According to cell-tower records, Dominguez was near his home during these first two telephone calls but was near Friedman's home during the final call.[101] Tomines also spoke with Dominguez at around 9:30 a.m. on January 30, 2007.[102] Detective Boucher explained that Tomines's telephone records established 112 telephone calls between Tomines and Dominguez from December 19, 2006, to February 1, 2007.[103]

Detective Boucher testified that a ledger was found on Friedman's computer showing that Tomines owed him approximately $200,000.[104] Because this amount was not secured by a

---

[97] ECF No. 23 at 37–39.

[98] *Id.* at 42.

[99] *Id.* at 48–51.

[100] *Id.* at 81–83.

[101] *Id.* at 89.

[102] *Id.* at 84, 91.

[103] *Id.* at 93.

[104] ECF No. 23-4 at 51, 54.

formal loan, meaning that there would be no evidence that Tomines owed these amounts, Detective Boucher testified about a possible motive for Tomines to have been involved in Friedman's attack: "[i]f he's dead, she doesn't have to pay him back."[105]  When Detective Boucher interviewed Tomines and asked her whether she owed Friedman money, she responded, "[n]ot really, not a lot of money."[106]  Detective Boucher also testified that Tomines wrote fraudulent checks from Friedman's account, forging his signature, and attempted to cash those checks the afternoon of January 29, 2007, and the afternoon of January 30, 2007.[107]  Detective Boucher further explained that "there was a [notarized] document in [Friedman's] safety deposit box" that showed that "he was a part owner of [Tomines'] business."[108]  Tomines denied that she and Friedman were partners, claiming that she solely owned her used-car business.[109]

Detective Boucher interviewed Dominguez about his involvement in the events that took place on January 30, 2007.[110]  Dominguez said that he and a lifelong friend, Saul, whose last name and telephone number were unknown to Dominguez, were trying to buy a car from Tomines.[111]  Dominguez stated that he only talked to Tomines two or three times and that Saul must have had his cellular telephone on the night that Friedman got stabbed.[112]  Later, after Dominguez was arrested, Boucher conducted a second interview with him[113] in which

---

[105] *Id.* at 54, 72.

[106] ECF No. 23 at 98–99, 111.

[107] *Id.* at 93-95.

[108] ECF No. 23-4 at 71.

[109] ECF No. 23 at 111–12, 134.

[110] *Id.* at 139–40.

[111] *Id.* at 142–43.

[112] *Id.* at 144.

[113] Dominguez asserts that his police-interview statements were involuntary because the detectives admittedly made fraudulent statements to him in order to pressure him into confessing,

Dominguez admitted that he was at Friedman's house the night Friedman was attacked; however, Dominguez explained that "he was sort [of] blocking Mr. Friedman from the other attackers, and he was trying to prevent him from getting hurt."[114]  Dominguez further explained that he was at Friedman's residence at 3:30 a.m. on January 30, 2007, because he "was supposed to go there to talk to" Friedman on Tomines's behalf.[115]  Dominguez elaborated that Friedman "was being mean to [Tomines], and she was going to give him a deal on a car."[116]  Dominguez also explained that Tomines had told him that she had problems with Friedman: "This guy have my truck, this guy live in my home and, and no pay me nothing."[117]

Aaron Friedman, Friedman's son, testified that his father's wallet was never found.[118] Similarly, Detective Boucher testified that Friedman's wallet was never located and there was no activity on Friedman's credit cards.[119]

---

so I should not consider them in my analysis of Ground 1.  *See* ECF No. 61 at 13.  Even if testimony has been admitted in error, however—which does not appear to be the case here—the *Jackson* analysis must be applied to all the evidence actually admitted by the state district court. *McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (explaining that "a reviewing court must consider all of the evidence admitted by the trial court, regardless of whether the evidence was admitted erroneously" (internal quotation marks omitted)).

[114] ECF No. 23-4 at 9.

[115] *Id.* at 12–13.

[116] *Id.* at 47.

[117] ECF No. 20 at 17.

[118] ECF No. 22-4 at 108.

[119] ECF No. 23 at 55–56.

Dominguez's brother, Ivan Dominguez,[120] was later arrested after his fingerprint was matched to a print found at Friedman's residence.[121]

### b. *Relevant statutes and legal theories*

Dominguez only disputes the sufficiency of the evidence related to his first-murder, conspiracy to commit robbery, and robbery convictions.[122] Sufficiency-of-the-evidence claims are judged by the elements defined by state law.[123] Nevada law defines murder as "the unlawful killing of a human being . . . [w]ith malice aforethought, either express or implied."[124] As it relates to the facts of this case, first-degree murder is murder that is "(a) [p]erpetrated by means of poison, lying in wait or torture, or by any other kind of willful, deliberate and premeditated killing" or "(b) [c]ommitted in the perpetration or attempted perpetration of . . . robbery, burglary, [or] invasion of the home."[125] Nevada law defined robbery as "the unlawful taking of personal property from the person of another, or in his presence, against his will, by means of force or violence or fear of injury, immediate or future, to his person or property."[126] "A taking is by means of force or fear if force or fear is used to: (a) Obtain or retain possession of the property; (b) Prevent or overcome resistance to the taking; or (c) Facilitate escape."[127]

---

[120] Dominguez notes that Ivan Dominguez was acquitted of robbery and conspiracy to commit robbery. ECF No. 61 at 14 (citing ECF No. 23-17). Because inconsistent jury verdicts do not render them erroneous, I note this fact but decline to grant Dominguez relief on this fact alone. *Standefer v. United States*, 447 U.S. 10, 25 (1980) ("While symmetry of results may be intellectually satisfying, it is not required.").

[121] ECF No. 23-4 at 19–20, 22.

[122] ECF No. 61 at 9.

[123] *Jackson*, 443 U.S. at 324 n.16.

[124] Nev. Rev. Stat. § 200.010(1).

[125] Nev. Rev. Stat. § 200.030(1)(a), (b).

[126] Nev. Rev. Stat. § 200.380(1).

[127] *Id.*

Regarding conspiracy, Nevada law provides that "whenever two or more persons conspire to commit . . . robbery . . . each person is guilty of a category B felony."[128]

The jury was instructed that they could find Dominguez guilty of robbery and murder under one of three theories of liability: Dominguez directly committed the crime; Dominguez and Tomines aided and abetted one another in the commission of the crime with the intent to commit the crime; or Dominguez and Tomines engaged in a conspiracy to commit the crime.[129]

### c.    *Challenged counts of conviction*

#### i.    *Murder*

Dominguez challenges the sufficiency of the evidence for his first-degree murder conviction based on causation of Friedman's death.[130]  The Nevada Supreme Court has explained that "a criminal defendant can only be exculpated where, due to a superseding cause, he was in no way the proximate cause of the result" and "[a]ny intervening cause must, effectively, break the chain of causation."[131]  "Thus, an intervening cause must be a superseding cause, or the sole cause of the injury in order to completely excuse the prior act."[132]  In *Lay v. State*, the Nevada Supreme Court held that "[a] defendant will not be relieved of criminal liability for murder when his action was a substantial factor in bringing about the death of the victim."[133]  Explaining this rule in the context of *Lay*, the Court stated that "[e]ven if the direct

---

[128] Nev. Rev. Stat. § 199.480(1).

[129] ECF No. 23-2 at 5–6.

[130] ECF No. 61 at 11.

[131] *Etcheverry v. State*, 821 P.2d 350, 351 (Nev. 1991) (internal quotation marks and citations omitted).

[132] *Id.*

[133] *Lay v. State*, 886 P.2d 448, 450 (Nev. 1994).

cause of [the victim's] death had been negligent medical care, the gunshot wound that

necessitated the medical care was a substantial factor in bringing about [the victim's] death."[134]

Here, Dr. Telgenhoff testified that Friedman's laparotomy was not elective—it was

necessary to ensure that Friedman had not suffered any direct internal injuries.[135] After the

laparotomy, in which Friedman aspirated vomit, he died from what Dr. Telgenhoff testified were

"complications of treatment for [his] stab wounds."[136] Dr. Telegenhoff also testified that "the

cause that brought him to his death [was] multiple sharp force injuries" and that "the underlying

process leading to the death was the attack."[137] Accordingly, although Dr. Telgenhoff conceded

that "[i]f it were not for the need for emergent surgery and the complications from that emergent

surgery, [Friedman] might have lived,"[138] the Nevada Supreme Court reasonably determined that

the stabbing "was a substantial factor in bringing about the death of" Friedman.[139] Indeed,

similar to the facts in *Lay*, even though the direct cause of Friedman's death was the

complications he suffered as a result of the laparotomy, the stab wounds that necessitated that

medical care were a substantial factor in bringing about his death.[140]

Outside the issue of causation, as the Nevada Supreme Court reasonably noted,

Dominguez admitted to being present in Friedman's residence when the attack took place.[141]

Dominguez asserted that he was only there to speak with Friedman and that he tried to protect

---

[134] *Id.*

[135] ECF No. 23 at 11.

[136] *Id.* at 12.

[137] *Id.* at 28, 35.

[138] *Id.* at 29.

[139] *Lay*, 886 P.2d at 450.

[140] *Id.*

[141] ECF No. 23-4 at 9.

Friedman from the attackers, one of whom was Dominguez's brother.[142] The jury disbelieved

this explanation. Because evidence is viewed "in the light most favorable to the prosecution,"[143]

the evidence in this case shows that the murder of Friedman was either willful, deliberate, and

premeditated, or committed in the perpetration of a robbery or home invasion.[144] Therefore,

based on this evidence, a rational trier of fact could have found beyond a reasonable doubt that

Dominguez—either directly or through aiding and abetting or through a conspiracy—committed

first-degree murder, such that the Nevada Supreme Court's ruling that there was sufficient

evidence to convict Dominguez of murder was reasonable.[145]

        *ii.*    Robbery

       Friedman told the 9-1-1 operator that the individuals who attacked him took his wallet.[146]

Detective Boucher and Friedman's son testified that Friedman's wallet was never found.[147] This

evidence demonstrates that Dominguez, who admitted to being at Friedman's residence during

the attack, either directly or through aiding and abetting or through a conspiracy, unlawfully took

Friedman's personal property by means of violence against Friedman's will.[148] And based on

this evidence, a rational trier of fact could have found beyond a reasonable doubt that

---

[142] *Id.* at 9, 12–13, 19–20, 22.

[143] *Jackson*, 443 U.S. at 319.

[144] Nev. Rev. Stat. § 200.030(1)(a), (b).

[145] *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; *Jackson*, 443 U.S. at 319; Nev. Rev. Stat. § 200.030.

[146] ECF No. 23 at 60, 63.

[147] ECF Nos. 22-4 at 108; 23 at 55–56.

[148] Nev. Rev. Stat. § 200.380(1).

Dominguez committed robbery, making the Nevada Supreme Court's ruling that there was sufficient evidence to convict Dominguez of robbery reasonable.[149]

### iii. Conspiracy to commit robbery

The Nevada Supreme Court has held that "conspiracy is committed upon reaching the unlawful agreement,"[150] and "[c]onspiracy is seldom susceptible of direct proof and is usually established by inference from the conduct of the parties."[151] Here, the evidence demonstrated that Tomines called Friedman on his way home from work to determine what time he would be home; that Tomines's story to Officer Findley was inconsistent with the 9-1-1 tape recording in that she told Officer Findley that she saw and spoke with Friedman before he called 9-1-1; that there was no sign of forced entry into Friedman's residence; that someone locked the front door from the inside after the attackers left; that Tomines spoke with Dominguez an aggregate of 112 times during the six weeks preceding the attack and robbery, including three times the night of the attack and robbery; and that Dominguez admitted that he was at Friedman's residence the night of the attack at the request of Tomines.[152] This evidence, along with the evidence that Friedman was robbed of his wallet, demonstrates that Dominguez and Tomines had an unlawful agreement to rob Friedman.[153]

---

[149] *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; *Jackson*, 443 U.S. at 319; Nev. Rev. Stat. § 200.380(1).

[150] *Nunnery v. Eighth Judicial Dist. Ct.*, 186 P.3d 886, 888 (Nev. 2008).

[151] *Gaitor v. State*, 801 P.2d 1372, 1376 n.1 (1990) (internal quotation marks omitted), *overruled on other grounds by Barone v. State*, 866 P.2d 291, 292 (Nev. 1993).

[152] ECF Nos. 22-3 at 47, 59; 22-4 at 37; 23 at 48–51, 62, 67, 78, 81–83, 93; 23-4 at 9, 12–13.

[153] *Nunnery*, 186 P.3d at 888.

Dominguez argues that any agreement established between him and Tomines was an agreement to physically attack Friedman, not to rob him.[154]  However, because Friedman's wallet was taken with violence and because a conspiracy to rob can be inferred from the parties' conduct,[155] a rational trier of fact could have found beyond a reasonable doubt that Dominguez conspired to commit robbery.  The Nevada Supreme Court's ruling that there was sufficient evidence to convict Dominguez of conspiracy to commit robbery was thus reasonable.[156]

Dominguez is denied federal habeas relief for Ground One.

### 2.    *Ground 2*

In Ground 2, Dominguez alleges that his federal constitutional rights were violated when his trial counsel failed to move to dismiss his murder and conspiracy-to-commit-murder changes because Friedman's surgery was an intervening cause of his death.[157]  Dominguez elaborates that, because the coroner's testimony and his autopsy report were unreliable, his trial counsel should have obtained the relevant medical records and consulted with an expert who could have definitively established that Friedman's surgery was unnecessary, thus providing a basis for a motion to dismiss.[158]

---

[154] ECF No. 61 at 13.

[155] *Gaitor*, 801 P.2d at 1376 n.1.

[156] *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; *Jackson*, 443 U.S. at 319; Nev. Rev. Stat. § 199.480(1).

[157] ECF No. 61 at 16–17.

[158] *Id.* at 18–19.

a. *Ground 2 was not adjudicated on its merits in state court.*

Dominguez included this claim in his first state habeas petition.[159]  In Dominguez's

appeal of the denial of his first state habeas petition, the Nevada Supreme Court rejected this

claim because he could not establish prejudice:

> [A]ppellant claimed that trial counsel was ineffective for failing to
> file a motion to dismiss counts 2 and 6.  Appellant argued that he
> could not be convicted of conspiracy to commit murder or murder
> based upon a "transferred intent" doctrine. Appellant failed to
> demonstrate that his trial counsel's performance was deficient or
> that he was prejudiced.  Appellant misused the term "transferred
> intent." Appellant's claim related to his belief that there was an
> intervening cause of death—pneumonia.  A claim challenging
> medical error as an intervening cause was raised and rejected on
> appeal. *Dominguez v. State*, Docket No. 55061 (Order of
> Affirmance, December 10, 2010).  Appellant cannot demonstrate
> prejudice for counsel's failure to file a motion to dismiss based on
> an intervening cause in this case.  Therefore, we conclude that the
> district court did not err in denying this claim.[160]

Dominguez also included this claim in his second state habeas petition.[161]  The Nevada Supreme

Court affirmed the denial of Dominguez's second state habeas petition because it was untimely,

successive, and procedurally barred.[162]

Dominguez again raised this claim in Ground 2 of his third state habeas petition.[163]  In

Ground 2 of his third state habeas petition, unlike his previous two state habeas petitions,

Dominguez discussed Dr. Bruce J. Hirschfeld's review of Friedman's autopsy report and Dr.

---

[159] *See* ECF No. 24 at 7.

[160] ECF No. 24-23 at 3.

[161] *See* ECF No. 24-10 at 5.

[162] ECF No. 24-25.

[163] *See* ECF No. 59-1 at 13.

Hirschfeld's opinion regarding Friedman's cause of death.[164]  The Nevada Supreme Court

affirmed the denial of Dominguez's third state habeas petition because it was untimely and

successive.[165]  The Nevada Supreme Court also explained that "appellant raised several of his

claims on direct appeal or in a previous petition and they were rejected by this court on appeal. . .

. Those claims are barred by the law-of-the-case doctrine and he has articulated no basis for

justifying further consideration of those claims."[166]  I previously noted that the Nevada Supreme

Court's order affirming the denial of Dominguez's third state habeas petition "did not 'specify

which claims were barred for which reasons.'"[167]  Dominguez asserts that this ground should be

reviewed de novo because this new claim, with the addition of Dr. Hirschfeld's report, has not

been adjudicated on the merits by the Nevada Supreme Court.[168]  I agree.

Dominguez's third state habeas petition contained two reports by Dr. Hirschfeld.[169]  In

his July 15, 2013, report, Dr. Hirschfeld noted that he reviewed Friedman's autopsy report and

Dr. Telgenhoff's trial testimony.[170]  Dr. Hirschfeld concluded, based on his review of these

documents, that "the autopsy findings in [sic] Mr. Friedman and trial testimony of Dr.

Telgenhoff provide a picture of an incomplete and inadequate clinical evaluation of the cause

and effect of multiple stab wounds sustained by Mr. Friedman in his untimely death."[171]  In his

March 8, 2015, report, Dr. Hirschfeld reported that, since his initial report was prepared, he had

---

[164] *See id.* at 15–18.

[165] ECF No. 59-13 at 2.

[166] *Id.* at 2–3.

[167] ECF No. 70 at 9 (citing *Koerner v. Grigas*, 328 F.3d 1039, 1053 (9th Cir. 2003)).

[168] ECF No. 85 at 51.

[169] *See* ECF Nos. 24-26, 57-1.

[170] ECF No. 24-26 at 2.

[171] *Id.* at 4.

26

reviewed "the American Medical Response ambulance records (AMR), supplemented on paper, as well as 594 pages of medical records from University Medical Center (UMC)" regarding Friedman's treatment.[172]  The review of these additional documents "confirm[ed] that Dr. Telgenhoff's trial testimony was inaccurate, and failed to accurately document Mr. Friedman's cause of death."[173]

Dr. Hirschfeld explained that it was his medical opinion, stated to a reasonable degree of medical probability, that "the direct and primary cause of Mr. Friedman's death was not an assault with sharp stab wounds penetrating injuries to the abdomen and right flank, which was only a proximate cause of his death because of the clinical nature in which he was treated."[174] Dr. Hirschfeld "question[ed] that if the jury had been educated about the true facts of Mr. Friedman's medical course, complications, and alternatives to the treatment he received, . . . whether or not it would have had an impact on their decision."[175]  In summary, Dr. Hirschfeld concluded, to a reasonable degree of medical probability that Friedman died from his medical treatment, not his stab wounds:

> the abdominal and right flank penetrating injuries he sustained were not life threatening at the time of his laparotomy, and would never have become life threatening if treated in an alternative fashion . . . by closure of the abdominal fascial defect, local wound care, with antibiotics, a CT scan of the abdomen and pelvis, and/or peritoneal lavage, with observation. Mr. Friedman, unfortunately, died due to an aggressive approach to his injuries in a stable patient, with a stem-to-stern exploratory laparotomy done on an emergency basis, and unfortunately complicated by nausea, severe vomiting, aspiration, cardiopulmonary arrest, and anoxic brain injury.  This series of circumstances could have been prevented; however, as stated before, my review of the medical records

---

[172] ECF No. 57-1 at 2.

[173] *Id.* at 10.

[174] *Id.* at 11.

[175] *Id.*

indicated that Mr. Friedman's care, at all times, met appropriate and acceptable standards, and there was no evidence of negligence in his care or treatment.[176]

"A claim has not been fairly presented in state court if new factual allegations either 'fundamentally alter the legal claim already considered by the state courts,' or 'place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it.'"[177] I find that this new evidence presented by Dominguez fundamentally altered the claim from its presentation in Dominguez's first state habeas action. Dr. Hirschfeld's report places the claim in a significantly different and stronger evidentiary posture than in state court, where Dominguez presented no evidence from outside the state-district-court record to support the claim.[178] Therefore, Ground 2 is subject to the procedural-default doctrine and is barred by that doctrine[179] unless Dominguez can overcome the procedural default.

      b.      *Ground 2 is procedurally defaulted.*

In *Coleman v. Thompson*, the Supreme Court held that a state prisoner who fails to comply with the state's procedural requirements in presenting his claims is barred by the adequate and independent state-ground doctrine from obtaining a writ of habeas corpus in federal

---

[176] *Id.* at 12.

[177] *Dickens v. Ryan*, 740 F.3d 1302, 1318 (9th Cir. 2014) (internal citation omitted) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986) and *Aiken v. Spalding*, 841 F.2d 881, 883 (9th Cir. 1988)).

[178] *See id.* at 1319 (explaining that "the new evidence creates a mitigation case that bears little resemblance to the naked *Strickland* claim raised before the state courts").

[179] *See* Nev. Rev. Stat. § 34.726, 34.800, 34.810; 28 U.S.C. § 2254(b)(1)(B)(i); *Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006) ("[I]f state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, . . . but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding.").

court.[180]  Such a procedural default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent" or the prisoner demonstrates cause for the default and prejudice resulting from it.[181]  To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule.[182]  For cause to exist, the external impediment must have prevented the petitioner from raising the claim.[183]  With respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension."[184]

In *Martinez v. Ryan*, the Supreme Court ruled that ineffective assistance of post-conviction counsel may serve as cause to overcome the procedural default of a claim of ineffective assistance of trial counsel.[185]  The *Coleman* Court had held that the absence or ineffective assistance of state post-conviction counsel generally could not establish cause to excuse a procedural default because there is no constitutional right to counsel in state post-

---

[180] 501 U.S. 722, 731-32 (1991) ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance.").

[181] *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

[182] *Id.* at 488.

[183] *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

[184] *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

[185] 566 U.S. 1 (2012).

conviction proceedings.[186]  In *Martinez*, however, the Supreme Court established an equitable

exception to that rule, holding that the absence or ineffective assistance of counsel at an initial-

review collateral proceeding may establish cause to excuse a petitioner's procedural default of

substantial claims of ineffective assistance of trial counsel.[187]  The Court described "initial-

review collateral proceedings" as "collateral proceedings which provide the first occasion to

raise a claim of ineffective assistance at trial."[188]

Dominguez was unrepresented throughout his initial state habeas action,[189] so the only

issue is whether Dominguez's underlying ineffective-assistance-of-trial-counsel claim is

substantial.  Because this claim, as now presented, was not adjudicated on its merits in state

court, I review the claim de novo.[190]

Although Dominguez's trial counsel may have strategically decided to cross-examine Dr.

Telgenhoff as to the cause of Friedman's death, as opposed to retaining an expert to dispute his

findings,[191] as the respondents point out, that does not demonstrate that Dominguez's trial

counsel was not deficient in this case.  Indeed, because Friedman's death was complicated by the

treatment that he received following the attack, the issue of causation should have been a main

topic at trial that deserved much attention and consideration.  It is unclear why Dominguez's trial

---

[186] *See Coleman*, 501 U.S. at 752–54.

[187] *See Martinez*, 566 U.S. at 9.

[188] *Id.* at 8.

[189] *See* ECF Nos. 24; 24-4 at 2; 24-23 at 2.

[190] *See Cone v. Bell*, 556 U.S. 449, 472 (2009).

[191] *Cf. Harrington*, 562 U.S. at 111 ("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.").

counsel did not attempt to present his own witness, like Dr. Hirschfield, to rebut Dr.

Telgenhoff's findings, especially considering the significance of his sole testimony on causation.

But even if Dominguez's trial counsel was deficient in investigating the cause of

Friedman's death, Dominguez fails to demonstrate prejudice regarding the specific claim at

issue—the failure to move to dismiss the charges.[192]  Whether the State met its burden of

proving proximate causation through the testimony of Dr. Telgenhoff was an issue for the jury—

the finder of fact.[193]  So, even if Dominguez's trial counsel had moved to dismiss the murder and

conspiracy to commit murder charges either prior to the trial or after the close of evidence, the

state district court would have denied that motion under Nevada law.[194]  Accordingly, because a

motion to dismiss the murder and conspiracy-to-commit-murder charges would have been

inappropriate and denied, there is not a reasonably probable that, but for counsel's errors, the

result of the proceeding would have been different.[195] Because Dominguez has not shown

---

[192] *Strickland*, 466 U.S. at 694.

[193] *See McNair v. State*, 825 P.2d 571, 573 (Nev. 1992) ("[I]t is the jury's function, not that of the court, to assess the weight of the evidence."); *Lay v. State*, 886 P.2d at 450 ("[I]t is exclusively within the province of the trier of fact to weigh evidence and pass on the credibility of witnesses and their testimony."); *Etcheverry*, 821 P.2d at 351 (explaining that the jury was accurately instructed on the issue of proximate cause).

[194] *See State v. Wilson*, 760 P.2d 129, 130 (Nev. 1988) ("[I]t was error for the trial court to take the case from the jury by dismissing the action at the close of the prosecution's case in lieu of giving the jury an advisory instruction to acquit because of insufficient evidence."); *State v. Corinblit*, 298 P.2d 470, 471 (Nev. 1956) (holding that "the trial court was in error in taking the case from the jury" when it "ordered the case dismissed [as requested by the defense] for failure of the state to prove a material element of the crime charged" after the State completed its case); *Silks v. State*, 545 P.2d 1159, 1161 (Nev. 1976) (explaining that, instead of moving to dismiss the charges against him, the defendant "should have moved that the jury be advised to acquit by reason of insufficient evidence"); *State v. Combs*, 14 P.3d 520, 521 (Nev. 2000) ("not[ing] that respondent's motion to dismiss the charges at the close of the State's case-in-chief was not properly made[] and should not have been granted by the district court judge. Instead, respondent should have moved for an advisory instruction to acquit pursuant to NRS 175.381(1).").

[195] *Strickland*, 466 U.S. at 694.

prejudice resulting from his trial counsel's alleged failure to dismiss the murder and conspiracy to commit murder counts, Ground 2 is not substantial. Accordingly, there is no cause to excuse Dominguez's procedural default.[196] Ground 2 is denied because it is procedurally defaulted.

### 3. Ground 3

In Ground 3, Dominguez alleges that his federal constitutional rights were violated when his trial counsel failed to investigate the State's witnesses.[197] Dominguez explains that the State noticed various medical professionals, including hospital personnel, paramedics, and coroner's office personnel, but his trial counsel failed to investigate these witnesses to determine whether they could have established that Friedman's surgery was an intervening cause of Friedman's death, especially in light of the fact that the State failed to call anyone but Dr. Telgenhoff, implying that the other medical professionals would not have been helpful to the State's case.[198] Dominguez explains that Dr. Hirschfeld's report establishes that an investigation was crucial in this case, so his trial counsel should have obtained Friedman's medical records and consulted an expert.[199]

### a. Ground 3 was not adjudicated on its merits in state court.

Dominguez included this claim in his first state habeas petition.[200] The Nevada Supreme Court rejected it because Dominguez did not identify any evidence that would have changed the outcome at trial:

> [A]ppellant claimed that trial counsel failed to conduct an
> investigation or interviews of the State's witnesses. Appellant

---

[196] *Martinez*, 566 U.S. at 9.

[197] ECF No. 61 at 23.

[198] *Id.* at 24.

[199] *Id.* at 24-25.

[200] ECF No. 24 at 16.

failed to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. While appellant listed the witnesses, appellant failed to indicate what evidence or testimony investigators or interviews would have uncovered that would have had a reasonable probability of altering the outcome at trial. Therefore, we conclude that the district court did not err in denying this claim.[201]

Dominguez also included this claim in his second state habeas petition.[202] The Nevada Supreme Court affirmed the denial of Dominguez's second state habeas petition because it was untimely, successive, and procedurally barred.[203]

Dominguez again raised this claim in his third state habeas petition.[204] That time, however, Dominguez discussed Dr. Hirschfeld's report.[205] The Nevada Supreme Court affirmed the denial of Dominguez's third state habeas petition because it was untimely and successive.[206] The Nevada Supreme Court also explained that "appellant raised several of his claims on direct appeal or in a previous petition and they were rejected by this court on appeal. . . . Those claims are barred by the law-of-the-case doctrine and he has articulated no basis for justifying further consideration of those claims."[207]

As with Ground 2, Dominguez asserts that this ground should be reviewed de novo because this new claim, with the addition of Dr. Hirschfeld's report, has not been adjudicated on the merits by the Nevada Supreme Court.[208] Again, I agree, as I find that the inclusion of Dr.

---

[201] ECF No. 24-23 at 4.

[202] ECF No. 24-10 at 19.

[203] ECF No. 24-25.

[204] *See* ECF No. 59-1 at 19.

[205] *See id.* at 20--23.

[206] ECF No. 59-13 at 2.

[207] *Id.* at 2–3.

[208] ECF No. 85 at 58.

Hirschfeld's report fundamentally altered this claim for the same reasons it did Ground 2.[209] Therefore, Ground 3 is also subject to the procedural-default doctrine and is barred by that doctrine unless Dominguez can overcome the procedural default. And because Dominguez was unrepresented throughout his initial state habeas action,[210] the only issue is whether Dominguez's underlying ineffective-assistance-of-trial-counsel claim is substantial. Because this claim, as now presented, was not adjudicated on its merits in state court, I review the claim de novo.[211]

### b. *Ground 3 is procedurally defaulted.*

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[212] "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[213] This investigatory duty includes investigating the defendant's "most important defense,"[214] and investigating and introducing evidence that demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence.[215] "[I]neffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case."[216]

---

[209] *Dickens*, 740 F.3d at 1318.

[210] *See* ECF Nos. 24; 24-4 at 2; 24-23 at 2.

[211] *See Cone v. Bell*, 556 U.S. 449, 472 (2009).

[212] *Strickland*, 466 U.S. at 691.

[213] *Id.*

[214] *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994).

[215] *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999).

[216] *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986).

The State listed numerous expert medical witnesses: Dr. Piotr Kubiczek, Paramedics/AMR Unit 3911, Dr. David McElmeel, Dr. Patrick Murphy, Dr. Sernariano, Dr. Deborah Kuls, Dr. Casey Michael, Dr. Laura Boomer, Dr. Shaw Tang, and Dr. Stephanie Woodard.[217]  It is unclear from the record what, if any, investigation was conducted by Dominguez's trial counsel into these possible witnesses.  But because causation was a significant issue at trial, to the extent that Dominguez's trial counsel failed "to make reasonable investigations" into the cause of Friedman's death, counsel was deficient.[218]

But even if counsel was deficient, Dominguez fails to show prejudice.[219]  First, as respondents note, Dominguez fails to demonstrate that an investigation into any of the State's witnesses would have led to favorable evidence.[220]  Second, even if Dominguez's trial counsel had presented the testimony of an expert such as Dr. Hirschfeld, that testimony would only have presented a question of fact as to Friedman's cause of death for the jury to resolve after also considering Dr. Telgenhoff's testimony.  It also must be remembered that Dr. Hirschfeld concluded that Friedman's death was the result of the aggressive medical approach taken during his hospitalization for the stab wounds.[221]  And Dominguez fails to demonstrate that testimony such as this would have changed the outcome of his trial when the jury was instructed that "[a] person is liable for the killing of another person even if the death of the victim was the result of medical treatment, so long as the wound inflicted upon the victim was the reason [that]

---

[217] ECF No. 21-10.

[218] *Strickland*, 466 U.S. at 688, 691.

[219] *Id.* at 694.

[220] *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation.").

[221] ECF No. 57-1 at 12.

necessitated the treatment."[222] So, although Dr. Hirschfeld opined that the wounds inflicted upon Friedman only necessitated conservative treatment, the treatment that Friedman received—aggressive or not—was still the result of the wounds inflicted upon Friedman.

Because Dominguez has not shown a reasonable probability that, but for counsel's failure to investigate the State's witnesses, the result of his trial would have been different,[223] Ground 3 is not substantial. Therefore, there is no cause to excuse Dominguez's procedural default.[224] Ground 3 is denied because it is procedurally defaulted.

### 4. *Ground 4*

In Ground 4, Dominguez alleges that his federal constitutional rights were violated when his trial counsel failed to object to the reasonable doubt jury instruction.[225] Dominguez explains that the reasonable-doubt instruction shifted the burden to him, lowered the State's burden of proof, and relieved the State of its obligation to prove the elements of the charged crime.[226] Dominguez focuses on the "govern or control" language in the following sentence of the instruction: "It is not mere possible doubt but is such a doubt as would *govern or control* a person in the more weighty affairs of life."[227] In Dominguez's appeal from the denial of his first state habeas petition, the Nevada Supreme Court rejected this theory because the instruction was proper:

> [A]ppellant claimed that trial counsel failed to object to jury instruction 39, which defined reasonable doubt. Appellant failed to demonstrate that his trial counsel's performance was deficient or

---

[222] ECF No. 23-2 at 33.

[223] *Strickland*, 466 U.S. at 694.

[224] *Martinez*, 566 U.S. at 9.

[225] ECF No. 61 at 29.

[226] *Id.* at 30.

[227] ECF No. 85 at 64.

36

that he was prejudiced. Jury instruction 39 contained the statutory definition of reasonable doubt as set forth in NRS 175.211, and NRS 175.211 has been previously determined to be constitutional. *Lord v. State*, 107 Nev. 28, 40, 806 P.2d 548, 556 (1991). Therefore, we conclude that the district court did not err in denying this claim.[228]

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."[229] "[T]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.'"[230] In assessing the constitutionality of a jury instruction, I must determine "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard."[231]

The Nevada Supreme Court's rejection of Dominguez's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court. Jury Instruction No. 39 read:

> The Defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense. A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an

---

[228] ECF No. 24-23 at 5.

[229] *In re Winship*, 397 U.S. 358, 364 (1970).

[230] *Victor v. Nebraska*, 511 U.S. 1, 5 (1994) (internal citation omitted) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)).

[231] *Id.* at 6.

> abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation. If you have a reasonable doubt as to the guilt of the Defendant, he is entitled to a verdict of not guilty.[232]

The Ninth Circuit evaluated the same reasonable-doubt instruction in *Ramirez v. Hatcher*.[233] The panel explained that it did "not endorse the Nevada instruction's 'govern or control' language," but "'not every unhelpful, unwise, or even erroneous formulation of the concept of reasonable doubt in a jury charge renders the instruction constitutionally deficient.'"[234] And the court held that, "[c]onsidering the jury instructions in this case in their entirety, . . . the 'govern or control' language did not render the charge unconstitutional."[235] Jury Instruction No. 39 also complied with Nevada law.[236]

Because the language of this instruction has been determined to be constitutional by the Ninth Circuit, and it complies with Nevada law, the Nevada Supreme Court reasonably concluded that Dominguez's trial counsel was not deficient for not objecting to the instruction.[237] Dominguez is denied federal habeas relief for Ground 4.

---

[232] ECF No. 23-2 at 42.

[233] 136 F.3d 1209, 1210–11 (9th Cir. 1998).

[234] *Id.* at 1214 (citing *Vargas v. Keane*, 86 F.3d 1273, 1277 (2d Cir. 1996)).

[235] *Id.*; *see also Nevius v. McDaniel*, 218 F.3d 940, 944 (9th Cir. 2000) (holding that the reasonable doubt jury instruction was identical to the one in *Ramirez*, so "[t]he law of this circuit thus forecloses Nevius's claim that his reasonable doubt instruction was unconstitutional").

[236] *See* Nev. Rev. Stat. § 175.211 (defining reasonable double and mandating that "[n]o other definition of reasonable doubt may be given by the court to juries in criminal actions in this State").

[237] *Strickland*, 466 U.S. at 688.

38

## 5. Ground 5

In Ground 5, Dominguez alleges that he is entitled to relief because of the cumulative effect of his trial counsel's errors.[238] In Dominguez's appeal of the denial of his first state habeas petition, the Nevada Supreme Court held: "appellant's claim that cumulative errors required relief lacks merit."[239] Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant."[240] Although I have determined that Dominguez's trial counsel may have been deficient regarding the allegations in Grounds 2 and 3, I also determined that Dominguez failed to demonstrate prejudice. I now determine, based on my previous reasonings in Ground 2 and 3, that the cumulative effect of these two deficiencies does not prejudice Dominguez.[241]

## C. Certificate of Appealability

The right to appeal from the district court's denial of a federal habeas petition requires a certificate of appealability. To obtain that certificate, the petitioner must make a "substantial showing of the denial of a constitutional right."[242] "Where a district court has rejected the constitutional claims on the merits," that showing "is straightforward: The petitioner must

---

[238] ECF No. 61 at 31.

[239] ECF No. 24-23 at 6.

[240] *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996).

[241] Dominguez requests an evidentiary hearing where he can offer proof "concerning the allegations in [his] amended petition." ECF Nos. 61 at 39; 85 at 72. I have already determined that Dominguez is not entitled to relief, and I find that neither further factual development nor any evidence that may be proffered at an evidentiary hearing would affect my reasons for denying Dominguez's remaining grounds for relief. So I deny Dominguez's request for an evidentiary hearing.

[242] 28 U.S.C. § 2253(c).

39

demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[243]  Because I have rejected petitioner's constitutional claims on their merits, and he has not shown that this assessment of his claims is debatable or wrong, I find that a certificate of appealability is unwarranted in this case.

### Conclusion

IT IS THEREFORE ORDERED that the petition **[ECF No. 61] is DENIED**, and because reasonable jurists would not find my decision to deny this petition to be debatable or wrong, a **certificate of appealability is DENIED**.

The Clerk of Court is directed to ENTER JUDGMENT accordingly and CLOSE THIS CASE.

Dated:  April 6, 2020.

_____
U.S. District Judge Jennifer A. Dorsey

---

[243] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).